UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

ELIZABETH MELENDEZ,

        *Plaintiff*,

v.

THE DEPARTMENT OF HOMELESS SERVICES OF THE
CITY OF NEW YORK,

        *Defendant*.
------------------------------------------------------------------------x

14 CV 06024 (LAP)

**SECOND AMENDED COMPLAINT**

Plaintiff Elizabeth Melendez, by her counsel, The Harman Firm, PC, alleges for her Second Amended Complaint against Defendant The Department of Homeless Services of the City of New York as follows:

## PRELIMINARY STATEMENT

1. In this employment discrimination action, Plaintiff Elizabeth Melendez ("Plaintiff" or "Ms. Melendez") seeks damages and costs against Defendant The Department of Homeless Services of the City of New York ("Defendant" or "DHS") for discriminating against Plaintiff by subjecting her to a hostile work environment based on her gender and race, which violates Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2012), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101–131.

## JURISDICTION AND VENUE

2. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims as Defendant violated Plaintiff's rights under Title VII.

3. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's claims brought under the NYCHRL.

4. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York as a substantial part of the events giving rise to Plaintiff's claims occurred within this district.

5. All conditions precedent to maintaining this action have been fulfilled. A charge of discrimination was filed with the Equal Employment Opportunity in Commission ("EEOC"). The EEOC issued a Right-to-Sue Letter dated April 22, 2014, relating to the discriminatory acts described in this Second Amended Complaint. This action was properly instituted within ninety (90) days of the issuance of the Right-to-Sue Letter.

## TRIAL BY JURY

6. Plaintiff respectfully requests a trial before a jury.

## PARTIES

7. At all times relevant hereto, Plaintiff Elizabeth Melendez was a resident of New York County in the State of New York.

8. At all times relevant hereto, Defendant DHS was an agency of the City of New York, with its principal place of business located at 33 Beaver Street, New York, New York 10004.

## STATEMENT OF FACTS

### Background Information

9. Elizabeth Melendez is a transgendered, Puerto Rican woman.

2

10. Ms. Melendez believes she always has been a woman. She legally changed her name to Elizabeth in and around 1986.

11. Since April 2003, Ms. Melendez has been employed as a caseworker for DHS.

12. On or about September 17, 2009, Ms. Melendez received a letter from Denita Williams, the Defendant's Director of Personnel, stating that effective September 24, 2009, DHS would transfer Ms. Melendez to the 30th Street Men's shelter (the "Shelter").

13. Upon information and belief, the Shelter provides temporary-housing assistance to single, adult men who are not accompanied by other adults or minor children.

14. During the approximately five (5) years Ms. Melendez worked at the Shelter, she was the victim of gender and race-based harassment from the Shelter's supervisors, employees, and clients.

**Examples of Ms. Harrison's Statements Related to Ms. Melendez's Gender and Race**

15. When Ms. Melendez began working at the Shelter, she reported to Julie Harrison, the Shelter's Clinical Director of Assessment.

16. On or about October 2, 2009, Ms. Harrison told Ms. Melendez, in substance, that she is a "Christian woman" and there were things that she did not "tolerate," implying that Ms. Melendez's gender identity was inherently immoral.

17. Ms. Harrison did not tolerate Ms. Melendez; Ms. Harrison subjected her to ongoing and grossly offensive statements related to her gender and race. Some salient examples are as follows:

18. On or about October 10, 2009, Ms. Harrison told Ms. Melendez that her blouse was not appropriate for the Shelter setting. Ms. Melendez had worn that particular blouse before

reporting to Ms. Harrison, and the blouse did not violate the Shelter's rule that all caseworkers "must dress professionally." Ms. Harrison objected to Ms. Melendez wearing a blouse only because Ms. Harrison believed Ms. Melendez not feminine enough to wear a blouse.

19. On or about October 31, 2009, Ms. Melendez wore a rabbit-ear hat to work, in accordance with the Shelter's Halloween costume tradition. Ms. Harrison told Ms. Melendez, to take off the hat because she was not "with her people at the Halloween parade in the East Village where all the gays are."

20. On or about November 20, 2009, the Shelter staff was preparing a list of food for the Thanksgiving lunch. Ms. Melendez suggested a brightly colored cake. Ms. Harrison, in front of all of the Shelter's staff, stated that she did not want a "transgendered or gay" cake.

21. On or about January 14, 2010, Ms. Harrison threated to send Ms. Melendez home for allegedly wearing inappropriate clothing. In response, Ms. Melendez told Ms. Harrison that Ms. Harrison needed to stop harassing her. Ms. Harrison responded by saying that, "[she] didn't know transgender people were so sensitive."

22. On or about April 20, 2010, Ms. Harrison sent Ms. Melendez a memorandum accusing her of being lazy. According to Ms. Harrison, Ms. Melendez was not a good caseworker and that "the quality of her work was a reflection of her frustrations with her gender." Ms. Harrison continued, stating Ms. Melendez was a "drama queen" and should be "working in a nightclub."

23. On or about May 6, 2010, Ms. Harrison told Ms. Melendez that she should quit working at DHS because her English was not strong enough to be a caseworker. Ms. Melendez has lived in New York for more than thirty (30) years and speaks English fluently.

24. On about March 30, 2011, Ms. Harrison demanded that Ms. Melendez clean a very ill client, who had not bathed in weeks and had a fetid smell. Ms. Melendez asked Ms. Harrison if one of the male Community Assistants could help the client bathe. Ms. Harrison stated that Ms. Melendez should do it because she was transgendered and, therefore, would enjoy seeing a man naked.

25. Ms. Harrison's disparaging statements of transgendered and Latino people were made only to hurt and humiliate Ms. Melendez, and they deeply offended Ms. Melendez.

**Examples of Ms. Harrison Allowing the Shelter's Clients to Abuse Ms. Melendez**

26. Ms. Harrison also allowed the Shelter's clients to abuse Ms. Melendez without consequences. Some salient examples are as follows:

27. On or about December 15, 2009, one of the Shelter's clients entered Ms. Melendez's office, unzipped his pants and took out his penis. When Ms. Melendez complained to Ms. Harrison, Ms. Harrison replied that "this comes with the territory" and "that [Ms. Melendez] needed to get used to it." Ms. Harrison told Ms. Melendez that she should find a different job where her gender would not be an issue.

28. On or about February 12, 2010, Ms. Melendez found on her desk a disturbing photograph of a naked transgendered woman showing her penis. When Ms. Melendez complained to Ms. Harrison about the photograph, Ms. Harrison ignored her.

29. On or about December 21, 2010, Ms. Melendez found a sign on her desk of a large crossed-out "F," implying "No Faggots" or "Not Female." When Ms. Melendez brought it to Mr. Harrison's attention, Ms. Harrison did nothing to correct the harassment.

30. On or about January 4, 2011, one of the Shelter's clients called Ms. Melendez a faggot. She called security to remove the client and informed Ms. Harrison of the incident. Ms. Harrison refused to report the incident or take any action to remedy the issue. Ms. Harrison also instructed the security guard not to make a report.

31. On or about May 11, 2011, Ms. Melendez found a drawing of a female figure with male genitals on her desk. The next day, when Ms. Melendez showed Ms. Harrison the drawing, Ms. Harrison ignored her and told her to "get used to it."

32. Ms. Harrison's conduct caused Ms. Melendez extraordinary distress, as she was cruelly harassed and criticized on a daily basis.

### Examples of Ms. Harrison Giving Ms. Melendez Specious Write-Ups

33. In and around February 2010, Ms. Harrison reinvigorated her campaign against Ms. Melendez. Ms. Harrison continuously searched for, and created, minor infractions for which to write up Ms. Melendez.

34. For example, on or about February 10, 2010, without any prior accusation, warning, or reprimand, Ms. Harrison sent Ms. Melendez a completely spurious memorandum accusing her of discriminating against the Shelter's black clients, a patently false allegation.

35. On or about March 9, 2010, Ms. Melendez requested a meeting with Ivonne Ballard, the Shelter's Administrator, to discuss Ms. Harrison's wrongful behavior and harassment. A meeting was scheduled so that Ms. Harrison could be present. During the meeting, Ms. Melendez's complaints were ignored. Instead, the meeting focused on Ms. Harrison's newly created and unfounded allegation that Ms. Melendez took too much sick leave.[1]

---

[1] Ms. Melendez has the human immune-deficiency virus (HIV) and occasionally must be absent from work to see her doctor or treat the condition.

36. All of Ms. Harrison's false and extremely offensive comments discouraged Ms. Melendez and impeded her ability to effectively perform her job.

### Examples of Ms. Harrison Endangering Ms. Melendez

37. Ms. Harrison regularly endangered Ms. Melendez because of her race and gender by directing the security guards at the Department of Homeless Services (DHS) not to help Ms. Melendez.

38. For example, on or about November 4, 2011, one of the Shelter's clients began insulting Ms. Melendez. He screamed in front of other clients that she was not a woman. Ms. Melendez, afraid and without any security guards present, tried to leave the office. The client followed her and physically assaulted her, pushing her and punching her on the side of her neck. No DHS Police were called until an hour after the incident occurred.

### DHS Transfers Ms. Harrison

39. On or about November 20, 2011, DHS transferred Ms. Harrison to another floor; however, her transfer did not stop the Shelter's clients from harassing Ms. Melendez. After months of allowing the Shelter's clients to disparage, harass, and humiliate Ms. Melendez, Ms. Harrison created an environment where the clients believed they could treat Ms. Melendez as equally cruel as Ms. Harrison did; she normalized the unlawful behavior.

40. As a result, Ms. Melendez continued to suffer discriminatory abuse from clients.

41. For example, on or about November 28, 2011, one of the Shelter's clients entered Ms. Melendez's office and called her a "nasty, mother-fucking faggot" and blamed her for Ms. Harrison's transfer. This type of unlawful, harassing conduct continued after Ms. Harrison's transfer.

42. In and around May 19, 2012, Ledean Burnham took over Ms. Harrison's responsibilities.

**Examples of Ms. Burnham's Discriminatory Conduct**

43. Ms. Burnham did nothing to abate the discrimination and harassment directed at Ms. Melendez; instead, she continued Ms. Harrison's campaign against Ms. Melendez. Salient examples of Ms. Burnham's conduct are as follows:

44. On or about June 6, 2012, Ms. Burnham called Ms. Melendez into the office to advise her that a co-worker had doubts that Ms. Melendez was a woman, and Ms. Burnham wanted to know if she was gay. Ms. Melendez responded that her sexuality was none of Ms. Burnham's business.

45. On or about November 20, 2012, Ms. Burnham told Ms. Melendez that she is a "Christian woman," implying that there was something morally wrong with Ms. Melendez's gender identity.

46. On or about December 11, 2012, Ms. Burnham called Ms. Melendez into her office to ask about Ms. Melendez's working relationship with Ms. Harrison. Ms. Melendez replied that she had nothing to say that was not already memorialized in formal complaints. Ms. Burnham coolly stated that "things [wouldn't] be any different with [her]," and thereafter continued and advanced Ms. Harrison's campaign against Ms. Melendez.

47. On or about December 28, 2013, Ms. Burnham and Ms. Harrison both interrupted Ms. Melendez in her office, stating that she was suspended for fifteen (15) days without pay. They brought DHS Police to escort Ms. Melendez out of the building in front of her clients, co-

workers, and other DHS employees. Ms. Melendez was humiliated by the experience. Ms. Melendez's union fought the meritless suspension and she was reinstated two days later.

### Examples of Ms. Burnham Enabling Discriminatory Conduct

48. Ms. Burnham allowed and instigated her co-workers and the Shelter's clients to disparage and harass Ms. Melendez. Some salient examples are as follows:

49. On or about December 29, 2012, a client called Ms. Melendez a faggot, which by now was a common occurrence. However, Ms. Burnham reprimanded Ms. Melendez for allegedly being "unprofessional."

50. On or about February 3, 2012, Linda Burns, the Shelter's assistant social worker, asked Ms. Melendez if she had a sex change operation. Ms. Melendez responded that it was none of her business.

51. On or about January 23, 2013, Ms. Burnham told Ms. Melendez that she did not approve of Ms. Melendez's clothing. Ms. Melendez told Ms. Burnham that she was dressed properly according to the Shelter's dress policy. Ms. Burnham replied that she meant that the type of clothes Ms. Melendez wore was inappropriate because "[she] was a man dressed as a woman."

52. On or about June 15, 2013, one of the Shelter's client taunted Ms. Melendez that he would get a "real woman" to help him, and that she was no lady and to "go to hell." When the client returned with Ms. Burnham, rather than defending Ms. Melendez from the client's discriminatory and insulting remarks, Ms. Burnham instigated him further by stating, in substance, "he's right."

53. At the Shelter, men were addressed as "mister" and women as "miss." In and around October 2013, Ms. Melendez noticed that the Shelter's staff, cleaning people, co-workers, and security guards had stopped calling her "Ms. Melendez" and only referred to her as "Melendez." The Shelter treated Ms. Melendez worse than her co-workers by stripping her of the personal title "miss."

54. On or about December 17, 2013, Ms. Melendez was conducting an assessment in Spanish because the client preferred to speak Spanish. Ms. Melendez is certified by the City of New York as a bilingual worker. Kimby Biewan, interrupted her stating, in substance, "there is too much Spanish going around here." Ms. Melendez was offended by this demeaning treatment.

55. On or about December 19, 2013, Ms. Melendez found a sign, stating "English Only" next to her office. Ms. Burnham had seen the sign but did not take it down nor do anything to correct it.

56. On or about February 20, 2014, Ms. Melendez found an anonymous questionnaire on her desk, asking whether she urinated sitting down or standing up.

**Examples of Mr. Burnham Giving Ms. Melendez Specious Write-Ups**

57. On or about January 25, 2013, Ms. Burnham wrote Ms. Melendez a memorandum again accusing Ms. Melendez of being unprofessional, alleging that two clients submitted complaints about her. Ms. Melendez was able to contact one of the clients, who stated that he never made any complaint and indeed wrote a letter to the Shelter stating that the contents of the memorandum were not true.

58. On or about March 19, 2013, Ms. Melendez received another memorandum from Ms. Burnham accusing her of misconduct. Ms. Melendez asked how many memoranda Ms. Burnham was going to write about her. Ms. Burnham responded, "You haven't seen anything yet," evidencing her spurious memoranda campaign.

59. On or about May 21, 2013, Ms. Melendez told Ms. Burnham to stop directing clients to make false complaints about her. Ms. Burnham, unabashedly, replied that she had "the right to do so."

60. By this point, Ms. Melendez had given up complaining about the hostile work environment at the Shelter. She hoped she would be transferred.[2]

**Examples of Ms. Burnham's Amplified Campaign of Gender and Race Harassment**

61. In and around January 2014, Ms. Burnham amplified her campaign of harassment against Ms. Melendez. Salient examples are as follows:

62. Ms. Burnham made racist comments to Ms. Melendez, for example, that "Spanish people think they run this shelter."

63. On or about January 22, 2014, one of the Shelter's clients approached Ms. Melendez and stated, in substance, "Ms. Burnham told me that you are a man pretending to be a woman." Ms. Melendez brought the client to Ms. Burnham's office to repeat what he had told her. Ms. Burnham told them both to leave and threatened Ms. Melendez, stating that she would have her investigated again for her purported misconduct.

64. On or about May 13, 2014, Ms. Burnham told Ms. Melendez that she would not approve any transfer for Ms. Melendez.

---

[2] Ms. Melendez requested transfers on July 4, 2010, December 20, 2011, and September 10, 2012.

11

### Ms. Melendez's Complaints, Emotional Distress, and Transfer

65. On or about April 6, 2011, Ms. Melendez requested a meeting with the Shelter Administrator, Ms. Ballard, to report Ms. Harrison's continuing harassment. Ms. Ballard did not take any corrective action.

66. In and around October 2012, Ms. Melendez began seeing a psychiatrist for job-related stress.

67. On or about August 11, 2014, Ms. Melendez received an email from Amiris Cesar, the Deputy Director of the Labor Relations Department, stating that there was an opening at the central office for a Caseworker position.

68. Ms. Melendez immediately replied to the email, expressing her interest in the transfer.

69. On or about August 14, 2014, Ms. Melendez was cleared for the transfer.

70. On or about August 18, 2014, Ms. Melendez reported to her new job assignment.

71. Ms. Melendez suffered direct and proximate emotional harm as a result of Defendant's conduct. This harm includes, but is not limited to, extreme mental anguish, emotional distress, humiliation, and damage to Ms. Melendez's reputation.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Hostile Work Environment Based on Gender in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17**

72. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 71 with the same force as though separately alleged herein.

73. Title VII prohibits employers from discriminating against any employee on the basis of gender with respect to the individual's compensation, terms, conditions, or privileges of employment.

74. Defendant discriminated against Plaintiff by subjecting her to a hostile-work environment because of her gender.

75. As a direct and proximate consequence of Defendant's gender discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

76. Defendant's discriminatory treatment of Plaintiff was willful and/or in reckless disregard of Plaintiff's federally protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

**SECOND CAUSE OF ACTION**
**Hostile Work Environment Based on Race in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17**

77. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 76 with the same force as though separately alleged herein.

78. Title VII prohibits employers from discriminating against any employee on the basis of race with respect to the individual's compensation, terms, conditions, or privileges of employment.

79. Defendant discriminated against Plaintiff by subjecting her to a hostile work environment based on her status as a Latina.

80. As a direct and proximate consequence of Defendant's race discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

81. Defendant's discriminatory treatment of Plaintiff was willful and/or in reckless disregard of Plaintiff's federally protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

### THIRD CAUSE OF ACTION
**Hostile Work Environment Based on Gender in Violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101–8-131**

82. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 81 with the same force as though separately alleged herein.

83. The NYCHRL prohibits employers from discriminating against their employees by subjecting them to hostile work environments based on gender stereotypes.

84. Defendant subjected Plaintiff to a hostile work environment because of her gender identity.

85. As a direct and proximate consequence of Defendant's gender discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

86. Defendant's discriminatory treatment of Plaintiff was willful and/or in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

### FOURTH CAUSE OF ACTION
**Hostile Work Environment Based on Race In Violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101–8-131**

87. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 86 with the same force as though separately alleged herein.

88. The NYCHRL prohibits employers from discriminating again their employees by subjecting them to hostile work environments based on race.

89. Defendant subjected Plaintiff to a hostile work environment based on her being Latina.

90. As a direct and proximate consequence of Defendant's race discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

91. Defendant's discriminatory treatment of Plaintiff was willful and/or in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## Request for Relief

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. for the first claim, actual damages to be determined at trial, but in no event less than $500,000;

B. for the second claim, actual damages to be determined at trial, but in no event less than $500,000;

C. for the third claim, actual damages to be determined at trial, but in no event less than $500,000;

D. for the fourth claim, actual damages to be determined at trial, but in no event less than $500,000;

E. an award of compensatory and punitive damages;

F. pre-judgment and post-judgment interest;

G. attorneys' fees and costs; and

H. such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 7, 2015

By: /s/ Edgar R.
Walker G. Harman, Jr. [WH-8044]
Edgar M. Rivera [ER-1378]
THE HARMAN FIRM, P.C.
*Attorneys for Plaintiff*
1776 Broadway, Suite 2030
New York, NY 10019
(212) 425-2600
wharman@theharmanfirm.com
erivera@theharmanfirm.com