```
UNITED STATES DISTRICT COURT                    USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                   DOCUMENT
ELIZABETH MELENDEZ,                             ELECTRONICALLY FILED
                                                DOC #:
                    Plaintiff,                  DATE FILED: 8/12/16

        -against-
                                                14 Civ. 06024 (AT)
THE DEPARTMENT OF HOMELESS
SERVICES OF THE CITY OF NEW YORK,               ORDER

                    Defendant.
```

ANALISA TORRES, United States District Judge:

Plaintiff, Elizabeth Melendez, brings this gender and race discrimination action against Defendant, the Department of Homeless Services of the City of New York ("DHS"), alleging that she was subject to a hostile work environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and related city laws. On August 7, 2015, Melendez filed a second amended complaint, which DSH moves to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is DENIED.

## BACKGROUND[1]

I.  Melendez's Claims

Melendez, a transgendered, Puerto Rican woman, has worked as a caseworker for DHS for thirteen years. 2d Amend. Compl. ¶¶ 9, 11, ECF No. 9. On September 24, 2009, Melendez was transferred to the 30th Street Men's shelter, a temporary housing facility for single, adult men. *Id.* ¶¶ 12, 13. While at the shelter, Melendez was subject to continual harassment, unusual disciplinary action, and unchecked threats of physical harm.

Melendez's first supervisor was Julie Harrison, the shelter's Clinical Director of Assessment. *Id.* ¶ 15. The pleadings recount several offensive remarks made by Harrison while

---

[1] The following facts are drawn from the pleadings and are taken as true for purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

she served as Melendez's supervisor, including: telling Melendez that Harrison was a "Christian woman" who could not "tolerate" things about Melendez; objecting to her clothing, at one point responding to Melendez's protests by stating that she "didn't know transgender people were so sensitive"; asking Melendez to remove a rabbit-ear hat she wore to the shelter on Halloween because Melendez was not "with her people at the Halloween parade in the East Village where all the gays are"; responding to Melendez's suggestion of purchasing a brightly colored cake for a holiday party by stating, in front of other shelter staff, that she did not want a "transgendered or gay" cake; sending a memorandum to Melendez saying that "the quality of [Melendez's] work [is] a reflection of her frustrations with her gender" and that Melendez is a "drama queen" who should be "working in a nightclub"; and requiring Melendez to bathe an ill male client because she was transgendered and, "therefore, would enjoy seeing a man naked." *See id.* ¶¶ 17-24.

Harrison also failed to report or punish shelter clients who harassed Melendez by, for example, showing Melendez their genitalia, leaving explicit drawings or photographs on Melendez's desk, and calling Melendez slurs. *See id.* ¶¶ 26-32. When Melendez reported the harassment to Harrison, Harrison responded by: ignoring her; telling Melendez that the abuse "comes with the territory" and that she should "find a different job where her gender would not be an issue"; and instructing a security officer not to take action in response to a client who accused Melendez of not being a woman before physically assaulting her. *See id.* ¶¶ 26-32, 37, 38. Harrison also disciplined Melendez for fabricated and minor infractions, sent Melendez a "spurious memorandum" accusing her of discriminating against the shelter's black clients, and complained to the shelter administrator that Melendez "took too much sick leave" without first raising those concerns with Melendez. *Id.* ¶¶ 33-35. Melendez alleges that after Harrison began working on another floor in the shelter, harassment by shelter clients continued, citing at least

one incident in which a client called Melendez a slur and blamed her for Harrison's transfer. *Id.* ¶ 41.

In May 2012, Ledean Burnham became Melendez's supervisor. *Id.* ¶ 42. Burnham also made several comments related to Melendez's gender, including: telling her that a co-worker "had doubts" about Melendez's gender and asking if she was gay; telling Melendez that Burnham was a "Christian woman" and that Burnham would treat Melendez as Harrison had treated her; and telling Melendez her clothing was inappropriate because she "was a man dressed as a woman." *Id.* ¶¶ 44, 45, 51. Like Harrison, Burnham refused to take action when Melendez faced harassment from clients: when a client called Melendez a slur, Burnham reprimanded Melendez for being "unprofessional"; when a client told Melendez to "go to hell" and that he wanted a "real woman" to help him, Burnham said that the client was "right"; and Burnham threatened to "investigate" Melendez when Melendez escorted a client to Burnham's office who had told Melendez that Burnham said she was "a man pretending to be a woman." *Id.* ¶¶ 49, 52, 63. Co-workers at the shelter refused to address Melendez as "miss" as they did with other female colleagues, *id.* ¶ 53, and in one instance Melendez found a questionnaire on her desk asking how she urinated, *id.* ¶ 56.

Burnham also sent disciplinary memoranda to Melendez, at one point reporting a client complaint about her which Melendez later discovered Burnham had fabricated. *Id.* ¶¶ 57, 58. When Melendez asked Burnham to stop sending her memoranda, Burnham replied that "[y]ou haven't seen anything yet," and when asked to stop directing clients to submit false complaints about Melendez, Burnham replied that she had "the right to do so." *Id.* ¶¶ 58, 59. On December 28, 2013, Burnham and Harrison entered Melendez's office, informing her that she was

3

suspended for fifteen days, and instructing DHS police to escort her from the building. *Id.* ¶ 47. Melendez was reinstated two days later after her union challenged the suspension. *Id.*

Melendez also details harassment she faced because of her race and ethnicity. At one point, Harrison suggested that Melendez quit her job because her "English was not strong enough to be a caseworker," even though Melendez speaks English fluently. *Id.* ¶ 23. A co-worker interrupted Melendez while she was interviewing a client in Spanish by stating "there is too much Spanish going around here." *Id.* ¶ 54. A sign stating "English Only" was posted by Melendez's office, and Melendez's supervisor did not remove the sign or take any corrective action in response. *Id.* ¶ 55. Burnham also told Melendez that "Spanish people think they run this shelter." *Id.* ¶ 62.

Three times Melendez requested, unsuccessfully, to transfer to a new position within DHS. *Id.* ¶ 60 n.2. And although Melendez reported the harassment she faced to the shelter administrator, no action was taken. *Id.* ¶ 65. On August 11, 2014, Melendez received an e-mail announcing a job opening in the DHS central office. *Id.* ¶ 67. She immediately expressed interest, was accepted, and on August 18, 2014, transferred out of the shelter. *Id.* ¶¶ 67-70. As a result of the harassment she faced at the shelter, Melendez began seeing a psychiatrist, *id.* ¶ 66, and suffered "extreme mental anguish, emotional distress, humiliation," and reputational harm, *id.* ¶ 71.

II.     Procedural History

On April 4, 2014, Melendez filed a charge with the EEOC alleging that DHS discriminated against her on the basis of her race and gender and retaliated against her for complaining about the discrimination. Decl. of Edgar M. Rivera ("Rivera Decl.") Ex. A, ECF No. 30. Melendez received a right to sue letter on April 22, 2014. *Id.* Ex. B. On July 16, 2014,

4

85 days later, Melendez, proceeding *pro se*, filed the initial complaint in this action and requested to proceed *in forma pauperis*. ECF Nos. 1, 2. Melendez's request was granted on December 10, 2014, and on January 6, 2015, the Court ordered Melendez to file an amended complaint, which she did on March 12, 2015. ECF Nos. 3–5. After retaining counsel who appeared on May 5, 2016, Melendez filed a second amended complaint on August 7, 2015. ECF No. 9. A summons was issued, and Melendez served DHS with the summons and pleadings on August 11, 2015. *See* Rivera Decl. Ex. K.

**DISCUSSION**

I.  Motion to Dismiss Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The court must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). That said, pleadings cannot survive by making "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

On a Rule 12(b)(6) motion, the Court may consider the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon in bringing her suit. *See Chambers v. Time Warner, Inc.*, 282 F.3d

5

147, 153 (2d Cir. 2002); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered."). When assessing the pleadings along with included documents, the Court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).

II. Failure to Serve and Statute of Limitations

DHS seeks to dismiss the complaint on the grounds that it is time-barred. Under Title VII, a plaintiff who receives a right-to-sue letter from the EEOC must file a complaint within 90 days. 42 U.S.C. § 2000e-5(f)(1). This time period is tolled once a complaint is filed, however it begins running again if service is not effectuated within the time allotted by the federal rules. *Hurd v. N.Y.C. Health & Hosps. Corp.*, No. 07 Civ. 3073, 2008 WL 2127659, *5 (S.D.N.Y. May 20, 2008). Melendez had 120 days from filing her amended complaint—until July 10, 2015—to serve a summons and complaint on Defendant. Fed. R. Civ. P. 4(m). After failing to do so, DHS contends, Melendez's time to bring her federal discrimination claims expired eight days later, on July 18, 2015.

Courts, however, have discretion under Rule 4(m) to grant an extension of time to effectuate service—generally, for good cause. *See id.*; *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 419 (S.D.N.Y. 2013) (listing the factors to consider when assessing whether good cause exists). Although "[a] party appearing without counsel is afforded extra leeway in meeting the procedural rules governing litigation," *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993), Melendez retained counsel before the time for service had run, and "[a]n attorney's inadvertence, neglect, mistake or misplaced reliance does not constitute good cause,"

*E. Refractories Co. v. Forty Eight Insulations, Inc.*, 187 F.R.D. 503, 505 (S.D.N.Y. 1999) (citation omitted). Even assuming that Melendez cannot show good cause, however, the Court may still grant an extension of time for service. *See Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007). This is especially so when a "dismissal without prejudice in combination with the statute of limitations would result in a dismissal *with* prejudice." *Id.* at 197 (emphasis in original). Weighing the relevant factors, *see Vaher*, 916 F. Supp. 2d at 420-21, the Court finds that an extension is warranted because the prejudice to Melendez from dismissing the complaint outweighs the prejudice to DHS from extending service, considering, for example, that Melendez's delay was not "unusually lengthy and unreasonably prolonged by [her] lack of diligence," and that Melendez advances a "colorable excuse for [her] neglect,"[2] *see id.* at 421 (citing *Zapata*, 502 F.3d at 198 & n.7). Accordingly, DHS' motion to dismiss the complaint on the grounds that it is time-barred is DENIED.

III. <u>Hostile Work Environment[3]</u>

DHS argues that Melendez fails to state a hostile work environment claim. Under Title VII,[4] a plaintiff can establish that she was subject to a hostile environment by showing that "the

---

[2] Specifically, the Court initially ordered that no summons would be issued after Melendez's initial complaint was filed, did not inform her of her responsibilities after filing the first amended complaint, and told her counsel that they were free to file a second amended complaint at which point the case would be reassigned to a presiding judge. *See* Rivera Decl. Ex. F, Aff. of Elizabeth Melendez, ¶¶ 30-36; *id.* Ex. G, Ltr. from Walker G. Harman, Jr. to Hon. Loretta A. Preska (May 8, 2015); *id.* Ex. I, Aff. of Walker G. Harman, Jr., ¶ 3.

[3] DHS contends that the complaint must be dismissed because Melendez's discrimination claims were released in a 2013 settlement agreement she signed to resolve a disciplinary charge filed against her by DHS. *See* Decl. of Kristen McIntosh Ex. A ¶ 5, ECF No. 26. The parties dispute the validity of the agreement, but the agreement has no bearing on Melendez's claims. Melendez alleges hostile work environment, a claim which is a "continuing violation" that by "its 'very nature involves repeated conduct.'" *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012) (citation omitted). "[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged [during a barred period], is permissible for the purposes of assessing liability," so long as one act "contributing to that hostile work environment" is timely. *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010). Therefore, even assuming that the settlement agreement precludes claims arising prior to it—which the Court does not hold—it does not preclude consideration of prior events when assessing Melendez's hostile environment claims.

[4] The same standard applies to Melendez's federal and state discrimination claims. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

7

complained of conduct: (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex [or other protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks and citation omitted). Courts must assess the claim based on the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Isolated incidents or episodic conduct will not support a hostile work environment claim." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999). *But see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (explaining that a hostile work environment may arise from a single incident that is "extraordinarily severe"). Instead, a plaintiff must allege that "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (internal quotation marks and citation omitted) (alterations in original). When assessing these claims, courts should "consider[ ] a variety of factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (internal quotation marks and citation omitted).

The Court finds that the pleadings plausibly allege a hostile work environment on the basis of Melendez's gender and race. More than an isolated incident or "mere offensive utterance," Melendez alleges that she was subject to unyielding harassment, both verbal and physical, by clients, co-workers, and supervisors alike. The remarks directed at her evince

8

animus toward her gender and race, and were so "pervasive and severe" and "humiliating" that the harassment altered the conditions of her employment—Melendez was driven to seek psychiatric counseling, and repeatedly requested to be transferred to a new location. Moreover, there is no indication that DHS did anything "to prevent and correct any harassing behavior." *See Parra v. City of White Plains*, 48 F. Supp. 3d 542, 551-52 (S.D.N.Y. 2014). Accordingly, because the allegations establish that DHS' discriminatory conduct was objectively severe, created an environment which Melendez subjectively perceived to be hostile, and was directed at Melendez's gender and race, the motion to dismiss is DENIED.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the second amended complaint is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 25.

SO ORDERED.

Dated: August 12, 2016
      New York, New York

_____
ANALISA TORRES
United States District Judge